UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MECCA ALLAH SHAKUR, | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | Case No. 3:19-cv-1412 (VAB) |
| | : | |
| RELIGIOUS COORDINATOR | : | |
| M. ELDERS, ET AL., | : | |
| *Defendants*. | : | |

**INITIAL REVIEW ORDER**

Mecca Allah Shakur ("Plaintiff") is currently incarcerated at Corrigan-Radgowski

Correctional Institution ("Corrigan-Radgowski") in Uncasville, Connecticut. He has filed a civil

rights Complaint *pro se* under 42 U.S.C. § 1983 against Religious Coordinator M. Elders

("Coordinator Elders"), Director of Religious Services Williams ("Director Williams"), Warden

Faucher, Captain J. Shebeanus, District Administrator Edward Maldonado, Acting District

Administrator Rodriguez, Level 1 Administrative Remedy Coordinator ("ARC") King, Level 2

ARC Ryba, Level 2 ARC Blanchard, Correctional Officer Roy, Correctional Officer Sweet, and

Staff Attorney N.K. O'Brasky. *See* ECF No. 1, at 1–5.

He alleges that, during his confinement at Corrigan-Radgowski from December 2017 to

February 2019, the Defendants interfered with the exercise of his right to practice his religion

and failed to properly process his grievances in violation of his right to due process.

For the reasons set forth below, the Complaint will be **DISMISSED** with leave to amend.

The Court will permit Mr. Shakur leave to file an amended complaint by **December 7,**

**2021**, if he can allege facts to state a plausible claim or claims that Director Williams,

Coordinator Elders, Captain Shebeanus, Officer Roy or Officer Sweet substantially interfered

with the practice of his sincerely held religious beliefs during the period from December 2017

and February 2019 in violation of the First Amendment and/or the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"). If no amended complaint is filed by this date, the

Court will issue an order directing the Clerk to enter judgment for all Defendants and to close

this case.

## I.  BACKGROUND

The Complaint is fifty-six (56) pages in length and includes eighty-three (83) paragraphs

of allegations, eight (8) paragraphs of legal claims, and multiple requests for relief. *Id.* at 5–55.

Many of the paragraphs of allegations include detailed descriptions of inmate requests,

grievances, and grievance appeals filed by Mr. Shakur, as well as detailed accounts of the

responses to the requests, grievances, and grievance appeals. Id. at 13–14 ¶¶ 45, 48–49; 16–24 ¶¶

55–69; at 26–36 ¶¶ 88–91. The Court finds it unnecessary to restate all of those allegations in

this order.

Mr. Shakur allegedly is an adherent of the Nation of Gods and Earths ("NOGE") religion,

commonly referred to as the Five Percenters. *Id.* at 5 ¶ 15. On February 21, 2017, in three federal

cases involving the First Amendment rights of three inmate adherents to the NOGE religion,

United States Magistrate Judge Merriam granted a motion for final approval of an executed

settlement agreement and retained jurisdiction over the cases and the settlement agreement until

February 14, 2020. *See* Order Granting Joint Mot. for Final Approval of Settlement, *Boyd v.

Semple, et al.*, No. 3:11-CV-824 (SALM), ECF No. 135 (Feb. 21, 2017) ("Boyd Settlement");

Order Granting Joint Mot. for Final Approval of Settlement, *Colon v. Semple, et al.*, No. 3:14-

CV-461 (SALM), ECF No. 90 (Feb. 21, 2017) ("Colon Settlement"); Order Granting Joint Mot.

for Final Approval of Settlement, *Harris v. Semple, et al.*, No. 3:15-CV-165 (SALM), ECF No. 69 (Feb. 21, 2017) ("Harris Settlement").

On December 15, 2017, Mr. Shakur allegedly wore a brown NOGE crown to the dining hall and ate his meal. Compl. at 5–6 ¶¶ 15, 19. As Mr. Shakur exited the dining hall, Lieutenant Hackett allegedly pulled him to the side and questioned him about his crown. *Id.* at 6 ¶ 18. Mr. Shakur allegedly explained that he had possessed the crown for years, it was listed on his property inventory as a kufi, and that prison officials had permitted him to retain the crown during his confinement at different prison facilities and during his confinement in the restrictive housing units at those facilities. *Id.* at 6 ¶ 20. Lieutenant Hackett allegedly informed Mr. Shakur that both Captain Shebeanus and Coordinator Elders had instructed him to confiscate the crown/kufi because inmates were only permitted to possess and wear white crowns/kufis. *Id.* at 6 ¶ 19.

Mr. Shakur allegedly stated that he understood that Muslim inmates could only wear white kufis, but that no memorandum had been posted in his housing unit indicating that adherents of the NOGE religion could only wear white crowns. *Id.* at 6 ¶ 20. He allegedly further explained that the settlement agreement pertaining to the rights of inmate adherents of the NOGE religion did not limit NOGE adherents to wearing white crowns. *Id.* Lieutenant Hackett allegedly admitted to Mr. Shakur that he was not familiar with the differences between kufis and crowns and escorted Mr. Shakur to his office. *Id.* 6 ¶ 21. After accessing the computer in his office in an attempt to obtain information regarding the NOGE religion and the crowns worn by adherents to the NOGE religion, Lieutenant Hackett allegedly escorted Mr. Shakur to speak to Coordinator Elders to discuss the order that Mr. Shakur's non-white crown be confiscated. *Id.* at 7 ¶ 22.

Coordinator Elders allegedly informed Mr. Shakur that his crown constituted contraband because it was not white and asked Mr. Shakur how he had obtained the crown. *Id.* at 7 ¶ 23. Mr. Shakur allegedly informed Coordinator Elders that he had possessed the crown for years and that his property inventory, which listed the crown as a kufi, reflected that property officers had authorized his possession of the crown. *Id.* at 6–8 ¶¶ 18, 23, 27. Elders allegedly indicated that under a directive or order of Director Williams, inmate adherents of the NOGE religion could only possess and wear white crowns with a white tassel. *Id.* at 7 ¶ 23. Mr. Shakur allegedly stated that the settlement agreement pertaining to the rights of inmate adherents of the NOGE religion did not limit NOGE adherents to wearing white crowns and no memorandum had been posted in his housing unit indicating that adherents of the NOGE religion could only wear white crowns. *Id.* at 7–8 ¶¶ 23–25. Coordinator Elders allegedly indicated that he had a memorandum from Director Williams that included the directive that inmate adherents of the NOGE religion could only possess and wear white crowns with a white tassel. *Id.* at 7 ¶ 24.

Lieutenant Hackett allegedly escorted Mr. Shakur to Religious Coordinator Elder's office to review the memorandum from Director Williams. *Id.* at 8 ¶ 27. As Mr. Shakur waited outside Elder's office, he allegedly became increasingly upset and ripped up his crown to prevent Lieutenant Hackett from confiscating it. *Id.* at 9 ¶ 28. Lieutenant Hackett allegedly then escorted Mr. Shakur back to his housing unit and indicated that Coordinator Elders would meet them there. *Id.* at 9 ¶ 29. Coordinator Elders allegedly arrived a short time later with a memorandum. *Id.* at 9 ¶ 31. Mr. Shakur allegedly scanned the memorandum and noted that it had not been drafted by Director Williams. *Id.* Rather, it allegedly was a document written by a warden at Brooklyn Correctional Institution. *Id.* Coordinator Elders allegedly insisted that the

4

memorandum had been written or authorized by Director Williams and denied Mr. Shakur's request for a copy of it. *Id.* at 10 ¶ 32. He allegedly instructed Mr. Shakur to submit a request for the memorandum under Connecticut's Freedom of Information Act ("FOIA"). *Id.*

Later that day, Mr. Shakur allegedly submitted a FOIA request to Coordinator Elders seeking a copy of the document that Elders had shown to him earlier and sent a request to Director Williams regarding Elders' conduct in ordering the confiscation of his crown. *Id.* at 10 ¶¶ 33–34. On December 16, 2017, Mr. Shakur allegedly sent Director Williams a letter seeking copies of any notices from his office or the Office of the Commissioner of Correction that included the directive that inmate adherents of the NOGE religion could not possess colored crowns. *Id.* at 10 ¶ 35.

On January 12, 2018, Correctional Officers Sweet and Roy allegedly escorted Mr. Shakur from the shower to the Admitting and Processing Area. *Id.* at 11 ¶ 38. After he arrived at the Admitting and Processing area, correctional officers allegedly strip-searched Mr. Shakur. *Id.* Officers Sweet and Roy allegedly also escorted Mr. Shakur's cellmate to the Admitting and Processing Area. *Id.* at 11–12 ¶ 40. As Mr. Shakur waited to be escorted back to his cell, Mr. Shakur allegedly became frustrated and punched a wall because he suspected that Officers Sweet and Roy were searching his cell in an attempt to set him up. *Id.* at 11 ¶ 39. A correctional officer allegedly called a mental health staff member to speak to Mr. Shakur. *Id.* Mr. Shakur allegedly informed the mental health staff member that he believed that officers were retaliating against him for making complaints about his religious rights. *Id.*

As officers escorted Shakur and his cellmate back to their cell, Mr. Shakur allegedly learned that Officers Sweet and Roy had questioned his cellmate about materials that he had

allegedly used to make kufis. *Id.* at 12 ¶ 40. Mr. Shakur's cellmate allegedly responded that he

did not know what a kufi was or whether Mr. Shakur had been making kufis. *Id.* Upon returning

to his cell, Mr. Shakur allegedly observed that his cellmate's property as well as his property had

been strewn all over. *Id.* at 12 ¶ 41. As he cleaned up the cell, he allegedly observed that

someone had ripped off the tape that had been affixed to the cover of his Qur'an for the last

fifteen years and that a piece of the cover had been torn off with the tape. *Id.* Two lieutenants

allegedly informed Mr. Shakur that he would have to address his claim about the damage to his

Qur'an with a supervisor in the intelligence unit. *Id.* at 12 ¶ 42. On January 12, 2018, Mr. Shakur

allegedly submitted a request to Deputy Warden Carlos, and, on February 5, 2018, Mr. Shakur

submitted a request to Warden Faucher claiming that Officers Sweet and Roy had deliberately

defaced his Qur'an. *Id.* at 13 ¶ 44; 15 ¶ 52. Mr. Shakur allegedly subsequently filed additional

requests, grievances, and grievance appeals with Warden Faucher and District Administrator

Maldonado regarding the conduct of Officers Sweet and Roy. *Id.* at 16–24 ¶¶ 55–67.

       On January 11, 2018, Director Williams allegedly responded to Shakur's December 16,

2017 request seeking information about Department of Correction policies regarding the type of

crown or crowns that had been approved for inmates who were adherents of the NOGE religion.

*Id.* at 13 ¶ 47. Director Williams allegedly confirmed that the Department of Correction had only

approved white crowns with a white tassel for inmates who practiced the NOGE religion and that

the decision to approve only white crowns was in compliance with the settlement in the case

involving the rights of inmate adherents to the NOGE religion. *Id.* Director Williams allegedly

explained further that the Department of Correction did not allow inmates to possess items that

included colors that were associated with security risk groups. *Id.*

On February 5, 2018, Mr. Shakur submitted another request to Director Williams outlining the terms of the settlement agreement that had been approved on February 22, 2017 in three federal cases involving the First Amendment rights of three inmates who adhere to the NOGE religion, *Boyd*, No. 3:11-CV-824 (SALM); *Colon*, No. 3:14-CV-461 (SALM); *Harris*, No. 3:15-CV-165 (SALM). *Id.* at 14–15 ¶¶ 50–51. On February 15, 2018, in a written response to Mr. Shakur's request, Director Williams allegedly indicated that the Department of Correction had concluded that a white crown with a white tassel was appropriate and consistent with the Department's obligations under the terms of the settlement agreement and that he would not be answering any further questions regarding the approval of the white crown. *Id.* at 15–16 ¶ 53.

On October 11, 2018, Mr. Shakur allegedly sent two requests to Director Williams regarding religious meals, religious oils, and items to be used during fasting. *Id.* at 24–25 ¶¶ 68–69. In the first request, Mr. Shakur allegedly claimed that the meals served to inmates who adhered to the NOGE religion for their Honor Day celebrations were from the common fare diet plan. *Id.* at 24 ¶ 68. He allegedly suggested that no one had contacted the headquarters of the NOGE located at the Allah School in Mecca (Harlem), New York, to determine that the meals served as part of the common fare diet met the requirements of meals to be served to adherents of the NOGE during Honor Day celebrations. *Id.*

In the second request, Mr. Shakur allegedly stated that officials had not permitted him to purchase religious items, specifically scented oils, from the commissary because he had been sanctioned to loss of commissary privileges for a short period of time. *Id.* at 24–25 ¶ 69. He allegedly also sought permission to purchase scented oils from an outside vendor that were not sold in the commissary and suggested that someone should have checked to see whether the oils

sold at the commissary were "sufficient" for the inmate adherents of the NOGE religion. *Id.* He allegedly further sought permission to purchase chew sticks to be used during fasting because the Miswaks, religious chew sticks that were sold at the commissary, were not the same as the chew sticks he sought to purchase. *Id.*

On November 13, 2018, Director Williams allegedly responded in writing to Mr. Shakur's October 11, 2018 requests. *Id.* at 25–26 ¶ 70. At that time, Mr. Shakur was no longer on loss of commissary status. *Id.* Director Williams allegedly stated that the common fare diet was available to any inmate, met all nutritional requirements as determined by registered dieticians within the Department of Correction, and did not include foods that were forbidden by religious dogma. *Id.* He allegedly further explained that the suitability of the common fare diet had been upheld by courts and permitted Shakur to meet the mandates of his religion. *Id.* Williams allegedly stated that he was unaware that the scented oils available at the commissary did not meet the religious mandates of those inmates who were adherents of the NOGE religion. *Id.* Williams allegedly asked Shakur to explain the difference between the Miswaks available at the commissary and the chew sticks that he had referenced in his request. *Id.*

On December 27, 2018, Mr. Shakur allegedly sent requests about the conduct of Director Williams to the Department of Correction Director of Programs and Treatment and to Director of Legal Affairs Sandra Sharr. *Id.* at 36–39 ¶¶ 86–87. Mr. Shakur allegedly claimed that Director Williams had failed to investigate whether the common fare diet met the tenets of the NOGE religion, had confiscated his religious crown, had refused to permit him to buy scented oils from an outside vendor, and was subverting the terms of the settlement agreement entered in three federal cases. *Id.*

8

On February 1, 2019, Staff Attorney O'Brasky allegedly responded in writing to Mr.

Shakur's complaints made to the Director of Program and Treatment and the Director of Legal

Affairs Sharr. *Id.* at 41–42 ¶ 92. Ms. O'Brasky allegedly stated that the Department of Correction

had consistently adhered to the terms of the settlement agreement approved by United States

Magistrate Judge Merriam on February 22, 2017 in *Boyd*, No. 3:11-CV-824 (SALM); *Colon*, No.

3:14-CV-461 (SALM); and *Harris*, No. 3:15-CV-165 (SALM). *Id.* She allegedly explained that

the common fare diet had been upheld by courts as complying with religious mandates. *Id.* She

allegedly further explained that although there had been no court decision addressing whether the

common fare diet met the requirements of the NOGE, she had not provided the Department of

Correction with any information to suggest the common fare diet did not in fact meet NOGE

requirements. *Id.* Ms. O'Brasky allegedly acknowledged that the settlement agreement permitted

NOGE crowns, as determined to be appropriate by the Department of Correction and consistent

with Administrative Directives, and that the Department of Correction had approved white

crowns with a white tassel. *Id.* Because his crown was not white, officials allegedly deemed it to

be subject to confiscation as a contraband item. *Id.* Ms. O'Brasky allegedly informed Shakur that

it was his responsibility to contact religious experts if he had questions about the tenets of his

religion. *Id.* at 43 ¶ 92.

## II.  STANDARD OF REVIEW

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints

against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is

frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks

monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see*

*also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner

Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory);

*Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district

court screen a civil complaint brought by a prisoner against a governmental entity or its agents

and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails

to state a claim upon which relief may be granted.'" (quoting 28 U.S.C. § 1915(a) &(b)(1)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short

and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P.

8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon

which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation

omitted).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the

speculative level" and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555,

570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual

allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation

of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless

distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III. DISCUSSION

Mr. Shakur claims that: (1) Director Williams, Coordinator Elders, Captain Shebeanus, and Officers Roy and Sweet violated his First Amendment right to practice his religion as well as his rights under RLUIPA; (2) Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, Director Williams, Coordinator Elders, Captain Shebeanus, District Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky violated his First Amendment right to practice his religion as well his rights under RLUIPA by failing to comply with the settlement agreement entered in *Boyd*, No. 3:11-CV-824 (SALM); *Colon*, No. 3:14-CV-461 (SALM); and *Harris*, No. 3:15-CV-165 (SALM); (3) Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, District Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky violated his right to due process when they improperly processed or failed to investigate his grievances; and (4) Officers Roy and Sweet violated his right to due process and his right to practice his religion by damaging his Qur'an. Mr. Shakur includes requests for declaratory and injunctive relief and requests for compensatory and punitive damages. He states that he is suing Director Williams in his individual and official capacities and all other Defendants only in their

11

individual capacities.

### A.  Section 1983 – Monetary Damages – Official Capacity

To the extent that Mr. Shakur seeks monetary relief from Director Williams in his official

capacity, the request is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S.

159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also

protects state officials sued for damages in their official capacity); *Quern v. Jordan*, 440 U.S.

332, 342 (1979) (Section 1983 does not override a state's Eleventh Amendment immunity).

Accordingly, the request seeking compensatory and punitive damages for violations of

Shakur's federal constitutional rights by Director Williams in his official capacity is dismissed

under 28 U.S.C. § 1915A(b)(2).

### B.  Section 1983 – Declaratory Relief – Official Capacity

Mr. Shakur seeks declaratory judgments that Director Williams, Coordinator Elders,

Captain Shebeanus, Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, District

Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky violated his

First, Eighth, and Fourteenth Amendment rights, his rights under RLUIPA, and the terms of the

settlement agreement in *Boyd*, No. 3:11-CV-824 (SALM), *Colon*, No. 3:14-CV-461 (SALM),

and *Harris*, No. 3:15-CV-165 (SALM). Compl. at 52–53.

Declaratory relief operates prospectively to enable parties to adjudicate claims before

either side suffers great damages. *See In re Combustion Equip. Assoc., Inc.*, 838 F.3d 35, 37 (2d

Cir. 1998). Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek

prospective injunctive and declaratory relief to address an ongoing or continuing violation of

federal law or a threat of a violation of federal law in the future. *See In re Deposit Ins.*

*Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000).

Mr. Shakur's requests seeking declarations that Defendants Williams, Elders, Shebeanus, King,

Blanchard, Ryba, Maldonado, Rodriguez, Faucher, and O'Brasky violated his rights under the

First, Eighth, and Fourteenth Amendments and RUILPA and violated the terms of a settlement

agreement in the past are barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and*

*Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment

"does not permit judgments against state officers declaring that they violated federal law in the

past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning

of *Young* . . . to claims for retrospective relief" (citations omitted)).

Furthermore, if Mr. Shakur prevails on his First, Eighth, and Fourteenth Amendment

claims and his RUILPA claim, the Court necessarily would determine that Defendants had

violated his rights under those constitutional amendments or that federal statute. Thus, a separate

award of declaratory relief is unnecessary. *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.

Supp. 2d 231, 249–50 (S.D.N.Y. 2006) ("Plaintiffs' declaratory judgment claim seeks resolution

of legal issues that will, of necessity, be resolved in the course of the litigation of the other

causes of action. Therefore, the claim is duplicative in that it seeks no relief that is not implicitly

sought in the other causes of action[ ] . . . [and] is dismissed." (citation omitted)). Accordingly,

the requests for declaratory relief are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**C.  Section 1983 – Injunctive Relief – Official Capacity**

The first three requests for injunctive relief seek orders directing Director Williams to

provide NOGE meals to Mr. Shakur on Honor Days that have been approved by NOGE

headquarters, to permit Mr. Shakur to purchase a religious crown in various colors and

displaying the image of the Universal Flag, and to permit Mr. Shakur to order scented oils from an outside vendor. Compl. at 53. The fourth request for injunctive relief seeks an order directing the Department of Correction to rework the administrative remedies process applicable to inmate grievances. *Id.* at 54. The Court addresses these requests in subsequent sections of this ruling.

At the end of the relief section of the complaint, Mr. Shakur includes three additional requests that specific items be awarded to him. He seeks an order that a new radio be mailed to him, a new television be ordered and mailed to him, and twenty new CDs be mailed to him and added to the number of CDs he is currently permitted to possess. Compl. at 55.

"[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To warrant preliminary injunctive relief, the moving party must demonstrate (a) that he or she will suffer "irreparable harm" in the absence of an injunction, and (b) either (1) a "likelihood of success on the merits or (2) sufficiently serious questions going to the merits [of the case] to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting [] preliminary [injunctive] relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405–06 (2d Cir. 2011) (internal quotation marks and citation omitted). If a party seeks a permanent injunction, he or she "must demonstrate (1) irreparable harm . . . and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012) (internal citations omitted). Thus, the standard for a permanent injunction is similar to the standard for a preliminary injunction, but a plaintiff must show actual success rather than a likelihood of success. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (internal citation omitted).

The requests for a radio, television, and twenty CDs are completely unrelated to the allegations asserted in the complaint. Because Mr. Shakur must demonstrate actual success on the merits of the claims that he asserts in the complaint to obtain permanent injunctive relief, the relief requested must relate to those claims. Thus, it would not be appropriate to grant Mr. Shakur the unrelated relief sought in the three requests included at the end of the complaint. *See, e.g.*, *De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunction appropriate to grant intermediate relief of "the same character as that which may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside the issues in the suit"); *Stewart v. INS*, 762 F.2d 193, 198 (2d Cir. 1985) (holding district court lacked jurisdiction over motion for injunctive relief relating to conduct not alleged in plaintiff's complaint); *Torres v. UConn Health*, No. 3:17-CV-00325 (SRU), 2017 WL 3713521, at *2 (D. Conn. Aug. 29, 2017) (preliminary injunctive relief not warranted because claim in motion was unrelated to underlying claims in complaint); *Mitchell v. New York State Dep't of Corr. Servs.*, No. 06-cv-6278 (CJS), 2011 WL 5326054, at *3 (W.D.N.Y. Nov. 3, 2011) (denying plaintiff's request for preliminary injunctive relief because "the facts underlying the request for injunctive relief [were] essentially unrelated to the underlying facts of the claims in this action, except for the fact that they arise in the prison context").

Accordingly, the requests for injunctive relief seeking an order that a radio, a television, and 20 CDs be awarded to Mr. Shakur will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### D.  Compliance with Settlement Agreement

Mr. Shakur contends that Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, Director Williams, Coordinator Elders, Captain Shebeanus, District Administrators Maldonado

15

and Rodriguez, Warden Faucher, and Attorney O'Brasky violated his First Amendment right to practice his religion as well as his rights under RLUIPA by failing to comply with the terms of a settlement agreement entered on February 21, 2017 in the three federal cases, *Boyd*, No. 3:11-CV-824 (SALM); *Colon*, No. 3:14-CV-461 (SALM); and *Harris*, No. 3:15-CV-165 (SALM), involving the First Amendment rights of three inmate adherents to the NOGE religion. As indicated above, at the time that United States Magistrate Judge Merriam granted the motion for final approval of the executed settlement agreement, she also retained jurisdiction over the cases and the settlement agreement for three years until February 14, 2020. *See* Boyd Agreement; Colon Agreement; Harris Agreement. Mr. Shakur contends that Defendants failed to comply with a term of the settlement agreement that permitted inmates who adhered to the NOGE religion to possess and wear head coverings, including crowns of any color, and a term of the settlement agreement regarding meals to be served on Honor Days to inmates who adhered to the NOGE religion.

In *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), the United States Supreme Court held that enforcement of a settlement agreement requires its own basis for federal jurisdiction, and in the absence of such a basis, a federal court retains jurisdiction to enforce a settlement agreement only if the dismissal order specifically reserves such authority or the order incorporates the terms of the settlement. *Id.* at 381. In 2015, the Second Circuit reaffirmed the "longstanding rule" announced by the United States Supreme Court in *Kokkonen* that there are only two ways in which a district court may retain ancillary jurisdiction to enforce the terms of a settlement agreement—by expressly retaining jurisdiction to enforce the agreement or by incorporating the terms of the agreement into its dismissal order. *Hendrickson v. United States*,

791 F.3d 354, 358–60 (2d Cir. 2015).

Although Judge Merriam retained jurisdiction over the enforcement of the terms of the settlement agreement in *Boyd*, *Colon*, and *Harris*, she did so only until February 14, 2020. Furthermore, even if Judge Merriam had jurisdiction over this matter, the proper method of challenging a failure to comply with a provision of the agreement would be to file a motion in one of those cases. At this point, a request to enforce a provision or provisions of the settlement agreement must be brought as a breach of contract action in state court. *See Kokkonen,* 511 U.S. at 382 (When a district court lacks ancillary jurisdiction over the enforcement of a settlement agreement, "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction.").

Accordingly, the claim that Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, Director Williams, Coordinator Elders, Captain Shebeanus, District Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky violated Mr. Shakur's First Amendment free exercise rights and his rights under RLUIPA by failing to comply with terms of the settlement agreement reached in the *Boyd*, *Colon*, and *Harris* cases—including the provisions of those agreements pertaining to the purchase and possession of a crown in various colors and including the image of the NOGE Universal Flag, and meals to be served to NOGE adherents on Honor Days—will be dismissed under 28 U.S.C. § 1915A(b)(1). The second and third requests for injunctive relief seeking compliance with the terms of the settlement agreement also will be dismissed under 28 U.S.C. § 1915A(b)(1).

### E.  The First Amendment Claims

Mr. Shakur contends that Director Williams, Coordinator Elders, Captain Shebeanus, and

17

Officers Roy and Sweet violated his right to practice the NOGE religion by denying him the opportunity to order scented oils and chew sticks from an outside vendor, failing to confirm whether the common fare diet that is served during NOGE Honor Days meets the requirements of the NOGE religion, refusing to permit him to wear a non-white crown, and damaging his Qur'an.

The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof [. . .]." U.S. Const. amend. I. It is well-established that an inmate has a First Amendment right to freely exercise his or her chosen religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." (internal citation omitted)). An inmate's First Amendment rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (internal quotation marks and citation omitted).

To state a First Amendment free exercise claim, an inmate is required to make a threshold showing "that the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006).[1]  In determining whether an

---

[1] In the last several years, the Second Circuit has recognized that a question exists as to whether an inmate must establish that the conduct of prison officials resulted in a "substantial burden" on his religious beliefs in order to state a First Amendment free exercise claim. *See Washington v. McKoy*, 816 F. App'x 570, 573–74 (2d Cir. 2020) ("[T]his Court has not yet decided whether a prisoner asserting a free exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs . . . ."); *Brandon v. Kinter*, 938 F.3d 21, 32 n.7 (2d Cir. 2019) ("Our Circuit has not yet decided whether the substantial burden requirement remains good law after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 887, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)."); *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a

inmate's religious beliefs are sincere, a district court should not "evaluate the objective reasonableness of the [inmate's] belief" but consider only whether the [inmate] "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

If an inmate asserts sufficient facts to state a plausible claim that prison officials engaged in conduct that burdened the free exercise of his religious beliefs, those officials then must "identify[] the legitimate penological interests that justif[ied] [their] conduct." *Salahuddin*, 467 F.3d at 275 (citations omitted). "The burden remains with the [inmate] to show that" the concerns articulated by the prison officials are "irrational." *Id.* (internal quotations omitted).

### 1. Crown

Mr. Shakur claims that, on December 15, 2017, Captain Shebeanus issued an order directing Lieutenant Hackett to confiscate his religious crown as contraband under a policy of the Department of Correction that inmate adherents to the NOGE religion could only possess and wear white crowns with a white tassel. Before Lieutenant Hackett could confiscate the crown, however, Mr. Shakur allegedly ripped it up. Compl. at 9 ¶ 28.

Mr. Shakur offers no facts regarding the significance of the non-white crown or how wearing a white crown with a white tassel would substantially burden his religious beliefs. Rather, he states that Department of Correction officials had permitted him to possess and wear the crown and that he voluntarily destroyed it on December 15, 2017. Compl. at 5–6 ¶¶ 15–20. Absent allegations regarding the significance of the non-white crown to Mr. Shakur's religious

---

'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" (quoting *Salahuddin,* 467 F.3d at 274–75 and citing *Ford,* 352 F.3d at 592)).  Because the issue has not yet been squarely addressed by the Second Circuit, this Court will continue to apply the substantial burden test. *See Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *3 & n.1 (noting the "Second Circuit['s] uncertainty" as to whether an inmate must continue to make a "threshold showing" that the conduct of the prison official substantially burdened his or her religious beliefs, but observing that "absent instruction to the contrary, Second Circuit courts have continued to assume the validity of the substantial burden test when addressing free

beliefs or that using a white crown with a white tassel would substantially burden his religious

beliefs, Mr. Shakur has not plausibly stated a First Amendment free exercise claim. *See Richard*

*v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *3 (D. Conn. Nov. 19, 2018) ("To

state a First Amendment free exercise claim, . . . [a plaintiff] must allege facts showing . . . the

challenged action substantially burdened his exercise of [a sincerely held religious] belief[,]"

including that the plaintiff (1) "holds a particular belief"; (2) "that the belief is religious in

nature"; and (3) "the challenged action substantially burdened his [or her] exercise of that

relief" (citing *Ford*, 352 F.3d at 588–91)).

Accordingly, the Court will dismiss this claim without prejudice. *See* 28 U.S.C. §

1915A(b)(1).

### 2.  Honor Day Meals

The Second Circuit has held that the Free Exercise Clause of the First Amendment

protects an inmate's right to a diet or food that is consistent with the dictates of his or her faith or

religious beliefs. *See McEachin v. McGuinnis*, 357 F.3d 197, 203–04 (2d Cir. 2004); *Ford*, 352

F.3d at 588, 597. Mr. Shakur alleges that the meals that are part of the Department of

Correction's common fare diet are offered to him as an adherent of the NOGE religion on the

days designated as NOGE Honor Days. He does not explain how the meals offered to him on

Honor Days are deficient or fail to comply with the tenets of the NOGE religion. It is apparent

that Mr. Shakur may not be aware of the dietary requirements of the meals to be served or eaten

by adherents of the NOGE on Honor Days.

Mr. Shakur alleges that, on February 5, 2018, he sent a written request to Director

Williams outlining the terms of the settlement agreement reached in *Boyd*, No. 3:11-CV-824

exercise claims." (citations omitted)).                    20

(SALM); *Colon*, No. 3:14-CV-461 (SALM); and *Harris*, No. 3:15-CV-165 (SALM). Compl. at 14-15 ¶¶ 50–51. In that request, Mr. Shakur noted that the settlement agreement listed the four Honor Days celebrated by adherents of the NOGE religion. *Id.* at 15 ¶ 51. Mr. Shakur does not include a description of the Honor Days in the Complaint filed in this action. The settlement agreement lists the following four Honor Days, February 22nd, the 2nd Sunday in June, the last Saturday in August, and October 10th, and states that inmate adherents to the NOGE religion may choose to fast on those days and that pre-sunrise and post-sundown meals will be provided to those inmates. *See* Boyd Agreement ¶ 5.5; Colon Agreement ¶ 5.5; Harris Agreement ¶ 5.5.  The agreement does not include a description of the meals to be offered or any dietary or nutritional requirements that must be met.

In a written request sent to Director Williams in October 2018, and in many grievances, grievance appeals, and other written requests filed from November 20, 2018 to December 27, 2018, Mr. Shakur contended that Director Williams should not have assumed that the common fare diet, which is also offered to Sunni Muslims, is acceptable to adherents of the NOGE religion. *Id.* at 24–40 ¶¶ 68–89. He accused Director Williams of failing to confirm with the NOGE headquarters that the foods offered by the Department of Correction as part of the common fare meal that are served to NOGE adherents on their Honor Days meet the requirements of the NOGE religion. *Id.* at 24 ¶ 68.

Mr. Shakur asserts no facts to suggest that the common fare meals that were served to him on NOGE Honor Days prevented him from practicing the NOGE religion or what he believes to be the practice of the NOGE religion. Nor does Mr. Shakur allege that he was unable to contact the headquarters of the NOGE to confirm whether the food items served to him as part

of the common fare diet on Honor Days met the dietary requirements of the NOGE religion. As

such, he has not stated a claim that the meals served to him substantially burdened the practice of

his religion. *See, e.g.*, *Washington v. McKoy*, 816 F. App'x 570, 573–74 (2d Cir. 2020) ("Courts

have held that a substantial burden occurs where a defendant's actions force a plaintiff to choose

between for[going] adequate nutrition or violating a central ten[et] of his religion." (internal

quotation marks and citations omitted) (alteration in original)).

Accordingly, the First Amendment free exercise claim pertaining to the Honor Day meals

served at Corrigan-Radgowski in 2018 and 2019 will be dismissed without prejudice. *See* 28

U.S.C. § 1915A(b)(1).

### 3. Scented Oils

On October 11, 2018, Mr. Shakur sent a written request to Williams claiming that prison

officials had denied him access to "articles of faith" because he had been sanctioned to loss of

commissary privileges. Compl. at 24–25 ¶ 69. He acknowledged that the commissary at

Corrigan-Radgowski sold different kinds of scented oils to be used for religious purposes but

contended that Director Williams had not contacted the headquarters of the NOGE to confirm

that the oils met the tenets of the NOGE religion. *Id.* Because Mr. Shakur was on loss of

commissary privileges at the time, he sought permission to purchase oils from an outside vendor

called Wellington Fragrance and noted that the vendor sold "different grades of oils some less

potent than regular scented oils." *Id.*

On November 13, 2018, Director Williams responded to the concerns raised in Mr.

Shakur's October 11, 2018 request. *Id.* at 25–26 ¶ 70. Director Williams noted that Mr. Shakur

was no longer restricted from purchasing items at the commissary, many different scented oils

were offered for purchase at the commissary, and he was unaware of objections to the oils as not meeting the requirements of the NOGE religion. *Id.* Director Williams confirmed that Miswacks were available for purchase at the commissary by any inmate irrespective of the inmate's religious beliefs and asked Mr. Shakur to explain the difference between a "chew stick" and a Miswack, if in fact there was a difference. *Id.* Mr. Shakur filed multiple grievances in November 2018 regarding his request to purchase scented oils from an outside vendor and the alleged failure of Williams to contact the headquarters of the NOGE to confirm that the oils sold in the Department of Correction commissary meet the tenants of the NOGE religion. *Id.* at 26–41 ¶¶ 71–80, 85–91.

Mr. Shakur does not assert that the oils sold in the commissary at Corrigan-Radgowski failed to meet the requirements of his religion or otherwise allege that the use of the scented oils from the commissary would substantially burden the exercise of his religious beliefs. Thus, he has not alleged that Director Williams' refusal to permit him to purchase scented oils from an outside vendor substantially burdened the practice of his religion. *See, e.g.*, *Vega v. Rell*, No. 3:09-CV-737 (VLB), 2013 WL 6273283, at *9 (D. Conn. Dec. 4, 2013), *aff'd*, 611 F. App'x 22 (2d Cir. 2015) (finding no substantial burden where "[Plaintiff] [did] not assert that his inability to purchase [a holiday food package at the prison commissary] . . . prevent[ed] him from practicing his religion"); *see also Torres v. Droun*, No. 301-CV-1844 (DJS) (TPS), 2004 WL 721729, at *7 (D. Conn. Mar. 30, 2004) (incarcerated individuals have "no constitutional right to purchase items from the commissary or outside vendors"). Mr. Shakur has failed to state a plausible claim that Director Williams violated his First Amendment right to practice the NOGE religion by allegedly denying his request to purchase scented oils from an outside vendor.

Accordingly, this First Amendment claim will be dismissed without prejudice. *See* 28

U.S.C. § 1915A(b)(1).

### 4. Chew Sticks

Mr. Shakur alleges that, on October 11, 2018, he submitted a request to Director

Williams seeking permission to purchase "chew sticks" from an outside vendor because he was

on loss of commissary privileges and because the type of chew sticks that he needed were not

sold in the commissary. He explained that the "chew sticks" were used during fasting and that

they were different from "Miswacks" which were sold in the commissary. *Id.* at 24–25 ¶ 69.

On November 13, 2018, Director Williams allegedly responded to Mr. Shakur's October

11, 2018 request. *Id.* at 25–26 ¶ 70. Director Williams noted that Mr. Shakur was no longer

restricted from purchasing items at the commissary and confirmed that Miswacks were available

for purchase at the commissary by any inmate irrespective of the inmate's religious beliefs. *Id.*

Williams asked Mr. Shakur to explain the difference between a "chew stick" and a Miswack if,

in fact, there was a difference. *Id.*

Mr. Shakur does not allege that he explained the difference between the "chew sticks"

and the Miswacks that were available in the commissary to Director Williams or that, at any time

after receiving the November 13, 2018 response, he resubmitted a request to Director Williams

to purchase "chew sticks" from an outside vendor. Nor has Mr. Shakur explained whether the

"chew sticks" are an important part of his sincerely held religious beliefs or how his lack of

access to these "chew sticks" would substantially burden his religious beliefs. *See Vega*, 2013

WL 6273283 at *9 (finding no substantial burden where "[Plaintiff] [did] not assert that his

inability to purchase [a holiday food package at the prison commissary] . . . prevent[ed] him

from practicing his religion"); *see also* Torres, 2004 WL 721729, at *7 (incarcerated individuals have "no constitutional right to purchase items from the commissary or outside vendors"). The Court thus concludes that Mr. Shakur has failed to state a plausible claim that Director Williams' decision not to grant his request to purchase "chew sticks" from an outside vendor in November 2018 substantially burdened his right to engage in the practice of his religious beliefs.

Accordingly, this First Amendment free exercise claim will be dismissed without prejudice. *See* 28 U.S.C. § 1915A(b)(1).

### 5. Qur'an

Mr. Shakur alleges that, on January 12, 2018, Officers Sweet and Roy searched his cell in an effort to locate materials that he might have used to fabricate the crown that he had been wearing on December 15, 2017 and that Coordinator Elders and Captain Shebeanus had determined did not comply with the Department of Correction's policy that only white crowns with white tassels could be worn by inmates. Although Mr. Shakur claims that Officers Sweet and Roy violated his First Amendment right to practice his religion by ripping the cover of his Qur'an, he does not allege that he was unable to use that Qur'an or how, even if it could be repaired, that using the allegedly torn one affected his faith. The Court thus concludes that Mr. Shakur has not plausibly alleged that the practice his religion was substantially burdened by the conduct of Officers Sweet and Roy in ripping a piece of the cover of his Qur'an during the search of his cell on January 12, 2018. *See Richard*, 2018 WL 6050898, at *3 ("To state a First Amendment free exercise claim, . . . [a plaintiff] must allege facts showing . . . the challenged action substantially burdened his exercise of [a sincerely held religious] belief." (citing *Ford*, 352 F.3d at 588–91)).

Accordingly, the First Amendment free exercise of religion claim asserted against Officers Sweet and Roy in their individual capacities will be dismissed without prejudice. *See* 28 U.S.C. § 1915A(b)(1).

**F. RLUIPA**

RLUIPA states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). In practice, RLUIPA claims are evaluated under a burden-shifting framework whereby a plaintiff must first demonstrate that the state has imposed a substantial burden on the exercise of his or her religion; the burden then shifts to the state to demonstrate "that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing 42 U.S.C. § 2000cc–1(a)).

The Second Circuit has held that RLUIPA "does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (citations omitted). Thus, a plaintiff may only obtain injunctive or declaratory relief as a remedy for a RLUIPA violation. *See Pilgrim v. Artus*, No. 9:07-CV-1001 (GLS/RFT), 2010 WL 3724883, at *16 (N.D.N.Y. Mar. 18, 2010) (limiting prisoner's RLUIPA claims to injunctive and declaratory relief against state correction officers).

To the extent that Shakur seeks monetary damages for violations of his rights under RLUIPA from Defendants in their individual capacities and also seeks monetary damages for

violations of his rights under RLUIPA from Director Williams in his official capacity, those claims will be dismissed. *See* 28 U.S.C. § 1915A(b)(1). Mr. Shakur seeks declaratory and injunctive relief only from Director Williams who is sued in both his individual and official capacities.

Accordingly, because Mr. Shakur has not asserted requests for either declaratory or injunctive relief against Coordinator Elders, Captain Shebeanus, Level 1 ARC King, Level 2 ARC Blanchard, Level 2 Ryba, District Administrator Maldonado, District Administrator Rodriguez, Warden Faucher, Attorney O'Brasky, Officer Sweet or Officer Roy in their official capacities, all claims asserted under RLUIPA against those Defendants will be dismissed.

As to Director Williams, Mr. Shakur has failed to assert facts to state a claim that Director Williams violated his rights under RUILPA for the same reasons that it determined that he had not plausibly alleged that Director Williams had substantially burdened the practice of his religion in violation of the First Amendment by prohibiting him from possessing and wearing a non-white crown, denying his requests to purchase scented oils and chew sticks, and serving him the common fare diet on NOGE Honor Days.

Accordingly, the requests seeking declaratory and injunctive relief from Director Williams in his official capacity for violating RLUIPA will be dismissed without prejudice. *See* 28 U.S.C. § 1915A(b)(1).

**G. Eighth Amendment**

Mr. Shakur contends that the actions of Defendants in prohibiting him from wearing a non-white crown, denying his requests to buy scented oils and chew sticks from an outside vendor, serving him the common fare meal for Honor Days without confirming that the meals

met the requirements of the NOGE religion, failing to properly process his grievances and

appeals, and searching his cell and damaging his Qur'an constituted cruel and unusual

punishment in violation of the Eighth Amendment.

Although a sentenced inmate may experience conditions that are "restrictive or even

harsh," the Eighth Amendment prohibits the imposition of conditions that "involve the wanton

and unnecessary infliction of pain" or violate "contemporary standard[s] of decency." *See*

*Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (*per curiam*) (citation omitted). To state a claim

of deliberate indifference to health or safety due to unconstitutional conditions of confinement,

an inmate must demonstrate both an objective and a subjective element. To meet the objective

element, the inmate must allege that he was incarcerated under a condition or a combination of

conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human

need[]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994); *Rhodes*, 452 U.S. at 347. The Supreme Court has identified

the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical

care, warmth, safety, sanitary living conditions, and exercise. *See Wilson v. Seiter*, 501 U.S. 294,

304 (1991); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989);

*Rhodes,* 452 U.S. at 348; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Prison

officials violate the Constitution when they deprive an inmate of his basic human needs[,] such

as food, clothing, medical care, and safe and sanitary living conditions." (internal quotation

marks omitted)). To meet the subjective element, an inmate must allege that the defendants

possessed culpable intent; that is, the officials knew that he faced a substantial risk to his or her

health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511

U.S. at 834, 837.

There are no allegations to support a claim that any defendant subjected Shakur to conditions of confinement that deprived him of a basic human need or life necessity or exposed him to a risk of harm to his safety or health. As a result, Shakur has not stated a claim that Defendants violated his Eighth Amendment rights.

Accordingly, the Eighth Amendment cruel and unusual punishment claims will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**H. Fourteenth Amendment – Grievances**

Mr. Shakur alleges that Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, District Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky failed to properly process and/or investigate his grievances and grievance appeals related to his requests to be permitted to purchase scented oils and chew sticks from an outside vendor, to wear a non-white crown and to be served meals approved by NOGE headquarters on Honor Days.

The Second Circuit has held that neither state directives nor "state statutes . . . create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights. *See Swift v. Tweddell*, 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [ ] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."); *Fernandez v.*

*Armstrong*, No. 02-CV-2252 (CFD), 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures [set forth in Administrative Directive 9.6] is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right."). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2003)).

Mr. Shakur's allegations that Level 1 ARC King, Level 2 ARCs Blanchard and Ryba, District Administrators Maldonado and Rodriguez, Warden Faucher, and Attorney O'Brasky neglected to properly process or failed to fully or properly investigate the conduct described in his requests, grievances, and grievance appeals in accordance with State of Connecticut Department of Correction Administrative Directive 9.6 do not rise to the level of a due process violation under the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless.").

Accordingly, the Fourteenth Amendment due process claims that pertain to the processing and investigation of Shakur's requests, grievance, and grievance appeals by Defendants King, Blanchard, Ryba, Maldonado, Rodriguez, Faucher, and O'Brasky, and the fourth request for injunctive relief that is associated with these claims, will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## I. Fourteenth Amendment – Damage to Religious Property

Mr. Shakur alleges that on January 12, 2018, Correctional Officers Sweet and Roy

searched his cell. When Mr. Shakur returned to his cell after the search, he noticed that a piece of the cover of his Qur'an had ripped where clear tape that he had used over the entire cover had been pulled off. *Id.* at 12 ¶¶ 41–42.

The Fourteenth Amendment's Due Process Clause protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV. The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment is not violated when a prison inmate's personal belongings are lost or damaged due to the negligent or intentional actions of correctional officers if the state provides an adequate post-deprivation compensatory remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543 (1981).

The State of Connecticut Department of Correction Administrative Directives and Connecticut statutes provide adequate remedies for the kind of deprivation Mr. Shakur alleges. Administrative Directive 9.6(9) provides that the Department of Correction's "Lost Property Board shall hear and determine any claim by an inmate in a correctional facility who seeks compensation not exceeding . . . []$3,500.00[] for lost or damaged personal property" and that an inmate may pursue his property claim with the Connecticut Claims Commissioner if the Board denies the claim completely or in part.[2] Conn. Gen. Stat. § 4-141 *et seq.* provides that claims for payment or refund of money by the state may be presented to the State of Connecticut Office of the Claims Commissioner. These state remedies are not inadequate simply because an inmate anticipates a more favorable remedy under the federal system. *See Hudson*, 468 U.S. at 535 ("[T]hat [Plaintiff] might not be able to recover under these remedies the full amount which he might receive in a [federal] action is not . . . determinative of the adequacy of the state

---

[2] *See* State of Connecticut Department of Correction Administrative Directive 9.6, http://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited January 27, 2021).

remedies.").

Mr. Shakur does not allege that he exhausted all available remedies with the Department of Correction's Lost Property Board or with the Office of the Claims Commissioner. He further does not allege that the State of Connecticut's procedures for processing property claims are inadequate. *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (summary order) (affirming dismissal of inmate's deprivation of property claim on the ground that the inmate had not asserted facts to show that the process provided by the State of Connecticut, including the opportunity to seek relief through the Office of the Claims Commissioner, was inadequate to compensate him for the deprivation of his property); *Edwards v. Erfe*, 588 F. App'x 79, 80-81 (2d Cir. 2015) (summary order) (same). As the Department of Correction and State of Connecticut provide adequate post-deprivation remedies, Mr. Shakur has not stated a plausible claim of a deprivation of property under the Fourteenth Amendment.

Accordingly, the Fourteenth Amendment due process claim related to the alleged damage to Mr. Shakur's Qur'an by Officers Sweet and Roy will be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## IV.  CONCLUSION

The requests for declaratory relief related to the claims asserted under § 1983; the requests for injunctive relief seeking a radio, a television, and 20 CDs; the Eighth Amendment claims; the Fourteenth Amendment due process claims that pertain to the processing and investigation of Shakur's requests, grievance and grievance appeals by Defendants King, Blanchard, Ryba, Maldonado, Rodriguez, Faucher, and O'Brasky, and the fourth request for

injunctive relief that is associated with these claims; the Fourteenth Amendment due process claim related to the alleged damage to Mr. Shakur's Qur'an by Officers Sweet and Roy; the requests for monetary damages for violations of Mr. Shakur's rights under RLUIPA from all Defendants in their individual capacities; and the requests for monetary damages for violations of Mr. Shakur's rights under RLUIPA from Director Williams in his official capacity are **DISMISSED** with prejudice under 28 U.S.C. § 1915A(b)(1) and the request seeking compensatory and punitive damages for violations of Mr. Shakur's federal constitutional rights by Director Williams in his official capacity is **DISMISSED** with prejudice under 28 U.S.C. § 1915A(b)(2).

The First Amendment free exercise claims asserted against Director Williams, Coordinator Elders, Captain Shebeanus, Officer Roy, and Officer Sweet and the requests seeking injunctive and declaratory relief from Director Williams for violations of Mr. Shakur's rights under RLUIPA are **DISMISSED** without prejudice under 28 U.S.C. § 1915A(b)(1). The claim that Defendants failed to comply with the *Boyd*, *Harris*, and *Colon* settlement agreement further is **DISMISSED** without prejudice under 28 U.S.C. § 1915A(b)(1).

The Court will grant Mr. Shakur leave to file an amended complaint by **December 7, 2021**, if he can allege facts to state a plausible claim or claims that Director Williams, Coordinator Elders, Captain Shebeanus, Officer Roy or Officer Sweet substantially interfered with the practice of his sincerely held religious beliefs during the period from December 2017 and February 2019 in violation of the First Amendment and/or RLUIPA. If no amended complaint is filed within the time specified, the Court will issue an order directing the Clerk to enter judgment for all Defendants and to close this case.

SO ORDERED at Bridgeport, Connecticut this 8th day of October, 2021.

_____/s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE